UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

CadleRock Joint Venture, L.P.,            Case No: 02cv16012, 02cv16019
and 02cv16022

Plaintiff

-vs-                                            Order

Royal Indemnity Company,

Defendant

The above-referenced cases were part of a multidistrict litigation proceeding consolidated before this Court for pretrial purposes pursuant to 28 U.S.C. § 1407. These three cases are scheduled for consolidated jury trial proceedings commencing on February 21, 2012. *See* Trial Order issued November 23, 2011, 02-16012, Doc. 113. The Trial Order required the parties to file any motions in limine on or before January 5, 2012.[1] Pursuant to the Trial Order, the parties filed multiple motions in limine, which have been fully briefed and now are ripe for decision.

Familiarity with the complex factual background of these cases is assumed. For detailed factual background, the Court refers the reader to the two bench trial opinions previously issued in these and related cases. (02-16000, Doc. 2459; 02-16014, Doc. 131)(collectively, the "Bench Trial Opinions").[2]

These actions are presently before the Court upon the motion of Royal Indemnity

---

[1] Due to a typographical error, the Trial Order actually provided that the date for filing motions in limine was January 15, 2012. However, the Court stated the correct date during a telephone conference on the record on November 21, 2011. All parties filed motions in limine on January 5, 2012.

[2] Where not defined herein, capitalized terms used in this Opinion have the meanings ascribed to them in the Bench Trial Opinions, as applicable.

1

Company ("Royal") for an Order precluding CadleRock Joint Venture, L.P. ("CadleRock") from introducing any evidence, or advancing arguments, relating to certain claims and issues that Royal contends already have been resolved by the Court (02-16012, Doc. 117; 02-16019, Doc. 92; 02-16022, Doc. 100)("Motion in Limine 2").

For the reasons set forth herein, Royal's Motion in Limine 2 is granted in part and denied in part. To the extent not resolved in this Opinion, the Court will consider proposed areas of inquiry, and associated objections, in context as presented at trial. While the Court reserves ruling on some of the issues raised by Royal's Motion in Limine 2 to the time of trial, all parties are cautioned that the scope of the matters remaining at issue for trial in these cases is extremely narrow. The Court will permit the introduction of evidence, and/or the advancement of arguments, only insofar as such evidence and/or arguments are material to an element of Royal's affirmative defense of fraudulent inducement, and/or Royal's associated third party claim against Blaine Tanner.[3]

## BACKGROUND

### A.    Factual Background and the Bench Trial Opinions

These actions arise from lease bonds issued by Royal to Commercial Money Center, Inc. ("CMC"), relating to equipment leases originated by CMC. CadleRock Joint Venture, L.P. ("CadleRock"), the plaintiff in these actions, has succeeded to CMC's interests in the lease bonds through a series of assignments. As the current obligee on the lease bonds, CadleRock seeks to recover against Royal on the lease bonds.

---

[3] In a separate motion in limine (02-16012, Doc. 121; 02-16019, Doc. 94; 02-16022, Doc. 102)("Motion to Structure Order of Proof"), Royal sought an Order that (1) Royal proceed first in the presentation of evidence; (2) liability and damages be bifurcated and tried to the same jury; and (3) all issues of fact be tried to the jury. In a separate Opinion issued concurrently with this one, this Court has granted Royal's Motion to Structure Order of Proof. As the Court's Opinion on Royal's Motion to Structure Order of Proof makes clear, the Court has found that the only liability issues remaining for determination in this trial are those relating to proof of the elements of Royal's fraudulent inducement defense, and its associated third party claim against Tanner.

Royal has denied liability to CadleRock on the lease bonds, and has asserted an affirmative defense based upon alleged fraudulent material misrepresentations and concealment of facts by CMC and its principals. Royal argues that CMC's fraud renders the lease bonds void, and seeks rescission of its bonds.[4]

The Court considers Royal's Motion in Limine 2 against the backdrop of the two Bench Trial Opinions issued by the Court in two separate bench trial proceedings previously conducted in these cases. The first bench trial encompassed nine separate cases (including the three now scheduled for jury trial), and was conducted from July 13-16, 2009. Following post-trial briefing, closing arguments were heard on September 10, 2009. The Court's Bench Trial Opinion was issued on May 28, 2010 (Doc. 2459)("Bench Trial Opinion I").

The second bench trial was conducted only in Case No. 02-16014, and involved JPMorgan Chase Bank, N.A., successor to Bank One, N.A. ("Bank One") and Safeco Insurance Company of America ("Safeco"). That bench trial was conducted on December 6-7, 2010. Following submission of proposed findings of fact and conclusions of law, closing arguments were heard on February 15, 2011. On August 16, 2011, the Court issued its Bench Trial Opinion. (02-16014, Doc. 131)("Bench Trial Opinion II").

Although the two bench trials were conducted in separate cases, the issues considered in both trials, and the findings reached in the two Bench Trial Opinions, were virtually identical. The bench trial proceedings were focused on the threshold, and potentially determinative, issue of who the parties intended to be the original obligee on the lease bonds issued by Royal and Safeco, Sureties in these cases. This issue has been referred to by the Court and the parties

---

[4] Royal has asserted counterclaims for rescission and recovery of certain payments made under reservation of rights. Royal also has a third-party claim against Blaine Tanner, principal of counterclaim defendants Guardian Capital XV, LLC; Guardian Capital IX, LLC; and Diversity Capital II, LLC (collectively, the "Guardian Entities"), for conspiracy with CMC and for aiding and abetting its fraud. That claim, for which Royal is also the plaintiff and bears the burden of proof, is largely coextensive with Royal's affirmative defense of fraud in the inducement.

throughout these proceedings as the "obligee issue."

On their face, the lease bonds designated CMC as obligee. In the Bench Trials, the plaintiffs (including CadleRock, the plaintiff here) bore the burden of demonstrating, by clear and convincing evidence, that the lease bonds should be reformed to substitute another entity as obligee. In its Bench Trial Opinions, the Court declined to find support for the reformation urged by the plaintiffs, either in the language of the transaction documents or in any extrinsic evidence of the parties' intent. The Court held, rather, that CMC was the original obligee on the lease bonds, and that the plaintiffs succeeded to their interests merely through a series of subsequent assignments. Thus, plaintiffs held their interests in the lease bonds as "assignees" rather than original "obligees."

The significance of the Court's finding on the obligee issue is that, as explained in detail in the Bench Trial Opinions, the lease bond assignees (including CadleRock) hold their interests in the lease bonds <u>subject to</u> any valid defenses that the Sureties may have against CMC. As noted above, the Sureties (including Royal) have asserted that they were fraudulently induced by CMC to enter into the lease bond transactions and, on that basis, have sought rescission of the transactions. The Court's determination on the obligee issue established that "fraud waiver" provisions contained in the lease bonds did not bar Royal from asserting its affirmative defense of fraud in the inducement as against CMC's assignees, including—in these cases—CadleRock. With the obligee issue decided, these cases now are scheduled for jury trial on Royal's affirmative defense of fraudulent inducement (and its associated third party claim against Tanner).

In its first Bench Trial Opinion, the Court held that, to prevail on its defense of fraud in the inducement under California law, Royal must show (1) a false representation or concealment

4

of a material fact; (2) knowledge of the falsity, or insufficient knowledge to make a representation; (3) intent to induce reliance upon the representation; (4) justifiable reliance; and (5) damages. *See South Tahoe Gas Co. v. Hofmann Land Improv. Co.*, 25 Cal. App. 3d 750, 765 (Cal. App. 1st Dist. 1972). Bench Trial Opinion I, Doc. 2459, at 178-79.  In considering Royal's Motion in Limine 2, the Court is mindful that evidence pertaining to these elements—and only these elements—is material to establishing or defeating Royal's affirmative defense.  The Court has considered Royal's Motion in Limine 2 in light of these standards.

**B.     The Instant Motion**

In its Motion in Limine 2, Royal moves for an Order precluding CadleRock from presenting evidence or advancing arguments as to any of the following claims or issues:

1.      Evidence regarding the scope or meaning of the fraud waivers contained in Royal's lease bonds, or any argument that the language of the bonds "estops" Royal from asserting its fraudulent inducement defense;

2.      Evidence regarding the presentation of the bonds to purchasing investors, or evidence relating to the timing or circumstances of Royal's rejection of bond claims;

3.      Evidence regarding Royal's rights or obligations under the Sale and Servicing Agreements ("SSAs"), or regarding lease servicing;

4.      Any expert evidence by Dan Cadle, or any factual evidence as to which Mr. Cadle lacks first-hand knowledge; and

5.      Any testimony by experts Paul Palmer or Charles Kerner beyond the scope previously delineated by the Court in its *Daubert* opinion.

For the reasons set forth herein, Royal's Motion in Limine 2 is <u>granted in part and denied in part</u>.

## DISCUSSION

A. **Evidence Regarding Scope or Meaning of the Fraud Waivers, and Estoppel Argument**

    1. **Fraud Waivers**

Royal argues, first, that based upon the Court's findings in the Bench Trial Opinions (as well as certain other opinions previously issued by this Court), CadleRock should be barred from presenting any evidence as to the existence of certain "fraud waiver" language in Royal's lease bonds, or the meaning of that language. Royal contends, essentially, that since the Court has found CMC to be the original obligee—a determination which permits Royal to raise fraud defenses against both CMC and its assignees—the fraud waiver provisions are irrelevant. Thus, Royal asserts, introducing evidence of either the existence or terms of those provisions would be both immaterial and confusing to the jury.

In its memorandum of law (02-16012, Doc. 136, at 7), CadleRock vigorously disputes Royal's assertion that the fraud waiver provisions are immaterial to the issues remaining for determination. Initially, CadleRock points out the narrow scope of the Court's holdings in the Bench Trial Opinions. CadleRock correctly notes that, although the Court found that the fraud waivers did not preclude Royal from asserting fraudulent inducement against CMC (or its assigns) <u>in its capacity as obligee</u>, the waivers still were effective to prevent Royal from voiding its bond obligations based upon any other type of fraud (e.g., fraud by a lessee, or fraudulent conduct by CMC in its capacity as servicer). *See* Bench Trial Opinion I, Doc. 2459, at 180, Bench Trial Opinion II, 02-16014, Doc. 131, at 126-129.

Moreover, CadleRock observes, paragraph 2 of the lease bonds, which contains the fraud waiver language, includes several other provisions delineating the precise extent of the

obligations undertaken by Royal in those bonds, including Royal's underwriting obligations. The language of these provisions should be admitted, CadleRock argues, in order to demonstrate the duties Royal assumed in the lease bonds. CadleRock argues that the scope and extent of those duties contractually undertaken by Royal bears on several aspects of Royal's fraudulent inducement defense, and may be particularly relevant to evaluating Royal's justifiable reliance on alleged misrepresentations by CMC.

In its reply memorandum of law (02-16012, Doc. 148), Royal suggests that admitting evidence as to the language of the fraud waivers will create confusion, by causing the jury to "second guess, or be uncertain as to the meaning and scope of" the fraud waivers. (Doc. 148, at 1). While Royal acknowledges the Court-imposed limitations on the applicability of the fraud waivers, it contends that those limitations provide no basis for admission of evidence relating to the fraud waivers. First, Royal argues, the meaning and language of the waivers is irrelevant to the issue of whether certain representations were made <u>in CMC's capacity as obligee</u>, since that inquiry is merely temporal, and based upon the dates of issuance of the bonds. Second, Royal asserts, it does not intend to introduce any evidence of fraud by the individual lessees, and thus CadleRock should not need to introduce the fraud waivers to prove that Royal is barred from doing so.

Royal does not address CadleRock's argument that the language of the bonds may bear on the obligations and duties assumed by Royal, and thus may be relevant to the reliance element of Royal's affirmative defense. This omission is troubling, since consideration of the duties Royal was expected to perform—and specifically, those facts it would or should have learned in the course of performance of those duties—may have particular significance to the reliance inquiry. CadleRock is entitled to rely on the provisions of paragraph 2, including the

underwriting obligations undertaken by Royal in that paragraph, to point out that Royal enjoyed broad access to documents in CMC's possession, and to argue that Royal should have been aware of material facts relating to CMC's operations far earlier.  In that context, placing the lease bonds before the jury with portions of their key provisions selectively excised appears to the Court both artificial and unfairly restrictive with regard to the rights of CadleRock.

The Court emphasizes that CadleRock is precluded from arguing or suggesting, in any way, that the fraud waiver provisions apply to bar Royal's defense against CadleRock.  While the Court will not preclude the jury from viewing the lease bonds in their entirety, the Court will take action to avoid any confusion in the minds of the jury by giving clear, specific instructions on this issue at the commencement of trial.  The Court's contemplated instructions will (1) indicate that none of the lease bond provisions, or any other provisions of law, apply to bar Royal from asserting its fraudulent inducement defense against CadleRock; and (2) clarify that the issues presented for jury determination are limited to whether Royal has proven the elements of its affirmative defense of fraudulent inducement (as well as its associated third-party claim against Tanner).

The portion of Royal's motion seeking to preclude CadleRock from introducing any evidence of the existence of the fraud waiver language is <u>denied</u>.

### 2. Estoppel Argument

Royal also argues that the Court's findings in the Bench Trial Opinions bar CadleRock from raising any argument that Royal is "estopped" from asserting its defense of fraudulent inducement.  CadleRock disagrees, taking the position that its "estoppel" argument is part of its case in chief on its contract claim, and that it is distinct from the determinations previously made by the Court in the Bench Trial Opinions.

CadleRock articulates its estoppel theory in detail, stating that "Royal is barred under California law from asserting a rescission claim because the rights of innocent third parties who relied on the existence of bonds would be detrimentally affected."  The essence of CadleRock's argument is that, since each of the investor banks relied on the existence of the Royal lease bonds, the interests of those banks (and CadleRock as their successor-in-interest) would be significantly harmed if Royal were permitted to rescind the bonds.

CadleRock bases its position on California case law providing that when "the rights of others have intervened and circumstances have so far changed that rescission may not be decreed without injury to those parties and their rights, rescission will be denied and the complaining party left to his other remedies." *Conservatorship of O'Connor*, 48 Cal. App. 4th 1076, 1099 (1996); *see also Beckwith v. Sheldon*, 165 Cal. 319, 324 (1913).  CadleRock asserts that this issue was never considered by the Court in the Bench Trial Opinions, and remains disputed.

Royal, on the other hand, argues that the Court addressed precisely this issue in the Bench Trial Opinions, when it held that CMC was the obligee on Royal's lease bonds, and CadleRock held its interests as a mere assignee of CMC.  Royal contends that the Court's Bench Trial Opinions, which held that Royal <u>was not barred</u> from seeking rescission as against CadleRock, effectively resolved any "estoppel" claim CadleRock may have had.

Moreover, Royal asserts, the Court's finding that CadleRock is a mere assignee of the rights of CMC is flatly inconsistent with any assertion by CadleRock of "innocent third party" status.  Royal argues, therefore, that CadleRock is barred from invoking any such status in light of the Court's holdings in the Bench Trial Opinions.  Royal notes that none of the cases cited by CadleRock involved an assignee, or any circumstance in which the "third-party" holder of rights "stood in the shoes" of the wrongdoer.  To the contrary, Royal argues, applying the "third party"

9

principles cited by CadleRock here, where the purported third party stands in the wrongdoer's shoes, would contravene established principles of law.

The Court agrees with Royal. Initially, there is no question not only that CadleRock's "estoppel" argument was previously raised and considered by the Court, but that the Court's findings in the Bench Trial Opinions disposed of that argument in full. Following the 2009 bench trial, the Guardian Entities argued in their post-trial brief (which was joined by CadleRock) that "The Sureties Are Estopped from Contesting the Obligee Status of the Investors." (02-16000, Doc. 2419, at 36-38; 02-16000, Doc. 2416, at 2 [CadleRock joinder]). In that brief, the Guardian Entities argued that "the assignment from CMC was made and accepted in reliance upon [the Sureties'] factual representations concerning the rights of the investors to receive payment under the bonds and their unconditional and absolute promise to pay the investors; and, at the time of assignment, the investors had no knowledge of CMC's fraud and extended credit or changed their position on the security of Sureties' promises. . . ." (02-16000, Doc. 2419, at 38). This argument is virtually identical in substance to that now presented by CadleRock.

Arguments similar to CadleRock's "estoppel" argument also were raised during the December 2010 bench trial in Case No. 02-16014, between Bank One and Safeco. In its Proposed Findings of Fact and Conclusions of Law (02-16014, Doc. 126, at 86, n. 7), Bank One cited *O'Connor*, 48 Cal. App. 4th at 1099, and *Beckwith*, 165 Cal. at 324, both cited here by CadleRock, in support of its argument that the CMC lease bond transactions effected a novation.[5]

---

[5] During the 2009 bench trial, CadleRock also argued in its pretrial brief (Doc. 2258, at 7-17) that it should be treated as an obligee by virtue of a novation. The Guardian Entities raised the same argument in their post-trial brief (Doc. 2419, at 33-35), which was joined by CadleRock. In both of the Bench Trial Opinions, the Court rejected these arguments, finding that the lease bond transactions involved a series of assignments, rather than a novation. While CadleRock now uses the term "estoppel" rather than novation, the argument introduced here by CadleRock is no more than a renewed attempt by CadleRock to recast itself as an intervenor in this transaction, rather than an assignee standing in the shoes of an original party, CMC. The Court declines to consider such a re-tooling of

In both Bench Trial Opinions, the Court applied a detailed equitable analysis in evaluating plaintiffs' requests for reformation of the lease bonds. In reaching its conclusions, the Court considered all of the parties' arguments, including both the estoppel and novation claims raised by the plaintiffs. By rejecting those arguments, the Court necessarily rejected the estoppel claims that CadleRock now seeks to assert.

Moreover, the Court agrees with Royal that the Court's holding that CadleRock was CMC's assignee is irreconcilable with CadleRock's claimed status as an "innocent third party." In the Bench Trial Opinions, the Court expressly found that CadleRock does not stand in its own shoes, but rather stands in the shoes of CMC as its assignee. As the Bench Trial Opinions make clear, the Court's determination of CadleRock's assignee status precludes CadleRock's continued invocation of estoppel principles as a sword against Royal.[6]

Significantly, the proceedings encompassing the two bench trials in these cases spanned a period exceeding two years. The two combined Bench Trial Opinions were extraordinarily detailed, totaling more than 300 pages of analysis. The Court's thorough and comprehensive findings in the Bench Trial Opinions resolved a central issue, which had been at the heart of these cases since their inception. The Court declines to reopen the issues underlying the Bench Trial Opinions to jury consideration and re-determination, in the context of this fraud in the inducement trial.

The portion of Royal's motion seeking to preclude CadleRock from arguing that Royal is estopped from asserting its fraudulent inducement defense is <u>granted</u>.

---

CadleRock's prior arguments. The Court already has found that CadleRock is an <u>assignee</u>, and all of CadleRock's rights and obligations in these cases flow from that status.

[6] To the extent CadleRock predicates its estoppel claim on the assertion that its predecessor <u>banks</u> were innocent third parties, the Court found in the Bench Trial Opinions that the banks also took their rights by virtue of assignments from CMC.

### B. Evidence Regarding Presentation of Bonds to Investors, and Evidence as to Royal's Rejection of Bond Claims

Royal asserts that CadleRock should be precluded from presenting any evidence regarding the manner in which Royal's lease bonds were presented to investors, or evidence as to Royal's rejection of investors' claims on the bonds. Royal bases this argument on an Opinion issued by this Court on March 11, 2009, which granted summary judgment on CadleRock's claim against Royal for bad faith, as well as CadleRock's claim for punitive damages. (02-16000, Doc. 2214)("Summary Judgment Opinion"). Royal further notes that, in response to a motion by Royal to dismiss CadleRock's claims for fraud, negligent misrepresentation, and fraudulent inducement, CadleRock voluntarily dismissed all three of those claims on July 11, 2011. (02-16000, Doc. 2498). Given the dismissal of CadleRock's previously-asserted claims, either voluntarily or through the Summary Judgment Opinion, Royal contends that evidence regarding the presentation of the bonds to investors, as well as evidence relating to Royal's rejection of bond claims, is no longer relevant to CadleRock's remaining breach of contract claim.

CadleRock argues that evidence of statements Royal made regarding the lease bonds, including statements made to purchasing investors, might bear on the reliance element of Royal's affirmative defense. This could be true, presumably, if Royal had made statements conveying information that it had received from CMC, or fraudulent omissions of CMC on which it had relied. CadleRock suggests that evidence of statements by Royal—even statements made after the closing of the Royal lease pools—might show Royal's earlier awareness of facts on which it now seeks to predicate its fraudulent inducement defense, and thus might vitiate Royal's claimed reliance. CadleRock further contends that statements and conduct by Royal in connection with Royal's consideration and rejection of the investors' bond claims might bear on similar issues.

12

In its reply memorandum (02-16012, Doc. 148), Royal argues that CadleRock has failed to identify a single concrete item of evidence that would be relevant to the issues to be tried. While Royal acknowledges that evidence of statements made by its representatives might conceivably be relevant to issues of reliance, it notes that CadleRock has identified no such statements. Royal asserts that no such relevant statements exist, and that CadleRock is relying on mere theoretical possibilities to support its proffer of a broad range of irrelevant evidence.

The Court has reviewed both parties' briefing relating to this issue. While the Court recognizes the theoretical possibilities of relevant evidence of the type suggested by CadleRock, the Court also observes that CadleRock has failed to identify any specific evidence that falls within that category, or even to state that it has such relevant evidence. As noted previously in this opinion, the Court views the issues for determination in this trial as those pertaining to the elements of Royal's affirmative defense of fraudulent inducement, and its associated third party claim against Blaine Tanner. Both parties are cautioned that the Court will admit evidence only insofar as it pertains to the narrow elements of those claims and defenses.

With respect to statements made to purchasing investors, the Court anticipates that the universe of relevant statements—to the extent such statements exist—would be narrow. Since the Court has precluded CadleRock from arguing or presenting evidence relating to an estoppel claim, such statements could be material only insofar as they served to undermine an element of Royal's affirmative defense—*i.e.*, falsity of the representations by CMC, or Royal's justifiable reliance. By way of example, statements by Royal representatives would be relevant to the extent they could demonstrate that (1) statements made by CMC were not actually false when made; (2) Royal knew of the falsity, and thus did not rely on those statements; or (3) Royal had access to information such that it should have known of the falsity of the statements, and thus its

13

reliance was not justifiable. Conversely, statements by Royal representatives would be irrelevant, and thus inadmissible, to the extent they demonstrated merely that Royal (1) misled investors as to the scope of the rights they were receiving; or (2) did not properly perform the duties that it assumed.

With respect to evidence relating to Royal's rejection of bond claims, the same principles apply. The Court notes that it is difficult to conceive of statements or conduct by Royal claims representatives that would be relevant in this context; however, the Court declines to render advisory determinations on evidentiary questions not presented here.

The portion of Royal's motion seeking to preclude CadleRock from introducing evidence regarding the presentation of the bonds to purchasing investors, or evidence relating to the timing or circumstances of Royal's rejection of bond claims, is <u>denied</u>, and all rulings on these issues are deferred to the time of trial. The parties are cautioned that the Court will admit evidence only insofar as it pertains to the elements of Royal's fraudulent inducement affirmative defense, or its associated third party claim against Tanner.

### C. Evidence Relating to the SSAs or Lease Servicing

Royal seeks to preclude CadleRock from introducing any evidence regarding the terms of the SSAs, Royal's obligations under the SSAs, whether Royal breached those obligations, and/or any evidence regarding lease servicing generally. Royal points out that the Summary Judgment Opinion, issued March 11, 2009, also granted summary judgment to Royal on CadleRock's cause of action for breach of the SSAs, since the Court found that, based on the terms of the assignment to CadleRock, CadleRock was not assigned rights under the SSAs. (02-16000, Doc. 2214, at 67-68). Based upon the Summary Judgment Opinion, Royal argues that any of this evidence is irrelevant to CadleRock's remaining breach of contract claim.

As with the lease bonds, CadleRock asserts that the provisions of the SSAs, including the obligations undertaken by Royal as servicer of the lease bonds, may bear on various elements of Royal's affirmative defense—specifically, reliance.  CadleRock argues, essentially, that certain aspects of Royal's role as servicer, including its access to CMC documents and its responsibilities for overseeing the performance of the leases, "put [Royal] in a unique position to be able to appreciate the risks associated with the CMC lease program." (CadleRock Memorandum of Law, 02-16012, Doc. 136, at 15).  Again, CadleRock argues, the jury cannot appropriately evaluate Royal's reliance on alleged misrepresentations by CMC without understanding the transactional structure, each party's respective obligations, and how those obligations would have impacted each party's knowledge.

In its reply memorandum (02-16012, Doc. 148), Royal disputes CadleRock's assertion that evidence concerning the SSAs—including evidence of Royal's obligations under those documents—is in any way probative of any element of its fraudulent inducement claim.  Royal notes that servicing of the leases under the SSAs did not begin until after the closing of the lease bond transactions.  Accordingly, Royal asserts, evidence relating to servicing can have no bearing on the representations that were made to Royal in the pre-closing phase.

The Court acknowledges Royal's argument that servicing of the leases in each bond pool commenced after the issuance of the lease bonds in that transaction.  There were, however, three transactions involving Royal bonds.  It is conceivable—if merely theoretical—that Royal's servicing duties in connection with the first lease pool might have given Royal access to information that should have given it cause to doubt the representations made by CMC in the later lease pool transactions.  The possibility exists, therefore, that some evidence that may be inadmissible with respect to certain transactions may be appropriate for consideration with

15

respect to Royal's liability for other lease pool transactions. Accordingly, CadleRock's evidentiary proffers in this regard must be considered on a case-by-case basis.

As with the Court's previous determinations in this Opinion, the Court considers the relevance of various items of evidence to be limited by the narrow scope of the matters at issue in this trial—specifically, the elements of Royal's fraudulent inducement defense, and its associated third party claim against Tanner. Within this framework, the Court declines to resolve evidentiary issues in a vacuum, and defers ruling on specific evidentiary proffers to the time of trial.

The portion of Royal's motion seeking to preclude CadleRock from introducing evidence regarding Royal's rights or obligations under the SSAs, or regarding lease servicing, is <u>denied</u>, and all rulings on these issues are deferred to the time of trial. The parties are cautioned that the Court will admit evidence only insofar as it pertains to the elements of Royal's fraudulent inducement affirmative defense, or its associated third party claim against Tanner.

### D. Expert Evidence by Daniel Cadle

Royal seeks to preclude Daniel Cadle, President of CadleRock, from testifying as to any matters as to which he lacks first-hand knowledge and thus, as to which his testimony would constitute purported "expert" testimony. In the Court's *Daubert* Order (02-16000, Doc. 2464, at 45), the Court excluded the proposed testimony of Mr. Cadle as an expert, finding, among other things, that Mr. Cadle was a mere proxy for CadleRock itself.

Royal is concerned, apparently, that CadleRock and/or Mr. Cadle seek to disregard this Court's prior Order, and to introduce the testimony of Mr. Cadle as to matters outside the scope of Mr. Cadle's first-hand knowledge. Royal points out that Mr. Cadle's first-hand knowledge (if in fact he has any) is very limited, since all of these transactions closed in or before April 2001,

and CadleRock had no connection with these transactions until December 2005. Accordingly, Royal requests that, prior to permitting Mr. Cadle to testify, the Court should require CadleRock to make a proffer, and should limit his testimony to factual issues of which he has first-hand knowledge.

CadleRock concedes, as it must, that Mr. Cadle is not entitled to give expert testimony in this matter, by virtue of the Court's earlier *Daubert* order. (02-16000, Doc. 2464). CadleRock argues, however, that Mr. Cadle is entitled to give factual testimony regarding matters about which he has first-hand knowledge, as well as matters that he may testify to as a corporate representative of CadleRock.

The essential disagreement between Royal and CadleRock is as to what constitutes the "first-hand" knowledge of Mr. Cadle, such that Mr. Cadle is entitled to testify to that knowledge as a fact witness. Royal has argued that Mr. Cadle cannot testify to anything that he learned based on an after-the-fact review of the lease files in CadleRock's possession; CadleRock suggests that Mr. Cadle may do so as a corporate representative of CadleRock.

CadleRock certainly is correct that Mr. Cadle may appear as a representative of CadleRock and testify as to certain matters (including matters recorded in CadleRock's records) on behalf of CadleRock. Because the Court has excluded Mr. Cadle as an expert, however, Mr. Cadle will not be permitted to interpret the lease files, to express opinions as to the meaning and/or significance of documents, or to engage in other types of analysis typically regarded as the province of "experts." In addition, as with all other evidence in this trial, CadleRock is cautioned that the testimony of Mr. Cadle will be admitted only insofar as it pertains to the elements of Royal's fraudulent inducement affirmative defense, or its associated third party claim against Tanner.

The portion of Royal's motion seeking to limit the testimony of Mr. Cadle to factual matters of which he has first-hand knowledge is <u>granted</u>. The portion of Royal's motion seeking to require CadleRock to make a proffer prior to offering the testimony of Mr. Cadle into evidence is <u>denied without prejudice</u>.

### E. Testimony of Paul Palmer and Charles Kerner

Royal argues, finally, for an Order limiting the testimony of Paul Palmer and/or Charles Kerner, two CadleRock expert witnesses, in accordance with the Court's prior *Daubert* Order (02-16000, Doc. 2464). CadleRock has stated, however, that it does not intend to call either Mr. Palmer or Mr. Kerner as a trial witness in this case. Accordingly, this portion of Royal's motion apparently is moot.

One final note. The motion which is the subject of this Order asserts almost entirely generic objections to broad categories of evidence, without, on the whole, identifying any specific anticipated testimony or exhibit containing evidence of the type sought to be excluded. To the extent that this ruling leaves the parties in doubt as to what's in and what's out, that is their fault.

If Royal has not learned from discovery just what evidence CadleRock intends to offer as to any of these categories, then it should have found out before now. If it does know, it should have shot at that evidence with a sniper scope, rather than a sawed-off shotgun.

Coming on the eve of trial into this ten year old set of cases, which involve complex transactions as to which this Court has no prior experience, is difficult enough. Being confronted with so-called motions in limine such as this (and others on which I am presently working) simply gets in the way of adjudicating the real issues in this case—which seem to me to be very, very few.

I intend to limit the evidence strictly to that handful of issues.

## CONCLUSION

For the reasons set forth herein, Royal's Motion in Limine 2 (02-16012, Doc. 117; 02-16019, Doc. 92; 02-16022, Doc. 100) is granted in part and denied in part. While the Court reserves ruling on some of the issues raised by Royal's Motion in Limine 2 to the time of trial, all parties are cautioned that the scope of the matters remaining at issue for trial in these cases is extremely narrow. The Court will permit the introduction of evidence, and/or the advancement of arguments, only insofar as such evidence and/or arguments are material to an element of Royal's affirmative defense of fraudulent inducement, and/or Royal's third party claim against Blaine Tanner.

So ordered.

s/ James G. Carr
Sr. United States District Judge