UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


CadleRock Joint Venture, L.P.,

                                                    Plaintiff

                         -vs-

Royal Indemnity Company,

                                                Defendant

Case No. 02-16012, 02-16019 and
02-16022


Order


The above-referenced cases were part of a multidistrict litigation proceeding consolidated before this Court for pretrial purposes pursuant to 28 U.S.C. § 1407.  These three cases are scheduled for consolidated jury trial proceedings commencing on February 21, 2012. *See* Trial Order issued November 23, 2011, 02-16012, Doc. 113.  The Trial Order required the parties to file any motions in limine on or before January 5, 2012.[1]  Pursuant to the Trial Order, the parties filed multiple motions in limine, which have been fully briefed and now are ripe for decision.

Familiarity with the complex factual background of these cases is assumed.  For detailed factual background, the Court refers the reader to the two bench trial opinions previously issued in these and related cases. (02-16000, Doc. 2459; 02-16014, Doc. 131)(collectively, the "Bench Trial Opinions").[2]

These actions are presently before the Court upon the motion of CadleRock Joint

---

[1] Due to a typographical error, the Trial Order actually provided that the date for filing motions in limine was January 15, 2012.  However, the Court stated the correct date during a telephone conference on the record on November 21, 2011.  All parties filed motions in limine on January 5, 2012.

[2] Where not defined herein, capitalized terms used in this Opinion have the meanings ascribed to them in the Bench Trial Opinions, as applicable.

Venture, L.P. ("CadleRock") for an Order precluding Royal Indemnity Company ("Royal") from introducing evidence at trial, or eliciting witness testimony, as to various matters. (02-16012, Doc. 118; 02-16019, Doc. 86; 02-16022, Doc. 94)("CadleRock Motion in Limine").[3]  For the reasons set forth herein, the CadleRock Motion in Limine is <u>denied</u>, with the exception of issues relating to CadleRock's Issue 4, as to which the Court reserves decision.  While all of the evidentiary determinations requested by CadleRock either are inappropriate or are premature at this point, the Court sets forth certain guidelines governing the scope and nature of admissible evidence in these cases.

## BACKGROUND

These actions arise from lease bonds issued by Royal to Commercial Money Center, Inc. ("CMC"), relating to equipment leases originated by CMC.  CadleRock, the plaintiff in these actions, has succeeded to CMC's interests in the lease bonds through a series of assignments.  As the current obligee, CadleRock seeks to recover against Royal on the lease bonds.

Royal has denied liability to CadleRock on the lease bonds, and has asserted an affirmative defense based upon alleged fraudulent material misrepresentations and concealment of facts by CMC and its principals.  Royal argues that CMC's fraud renders the lease bonds void, and seeks rescission of its bonds.[4]

The Court considers the CadleRock Motion in Limine against the backdrop of the two Bench Trial Opinions issued by the Court in two separate bench trial proceedings previously

---

[3] By a Notice served in all three of these cases (02-16012, Doc. 123; 02-16019, Doc. 88; 02-16022, Doc. 96), third party defendant Blaine Tanner joined in the CadleRock Motion in Limine.

[4] Royal has asserted counterclaims for rescission and recovery of certain payments made under reservation of rights. Royal also has a third-party claim against Blaine Tanner for aiding and abetting the fraud of CMC. That claim, for which Royal is also the plaintiff and bears the burden of proof, is largely coextensive with Royal's affirmative defense of fraud in the inducement.

conducted in these cases.  The Court's holdings in the two Bench Trial Opinions were described in the Court's recently-issued Opinion on Royal's Motion in Limine 2 (02-16012, Doc. 176), and the Court refers the reader to that Opinion, and to the Bench Trial Opinions, for detailed discussion.  The Court refers to the respective Bench Trial Opinions (02-16000, Doc. 2459; 02-16014, Doc. 131, respectively) as necessary throughout this Opinion.

In its Motion in Limine, CadleRock asks the Court to preclude Royal from introducing any evidence or testimony as to each of the following:

(1)     Evidence challenging the effectiveness of the leases bonded by Royal, or the Royal lease bonds.

(2)     Evidence challenging the amounts due and owing under the leases.

(3)     Evidence of alleged fraudulent omissions concerning the business of CMC.

(4)     Evidence of Information Known to Michael Anthony But Not Disclosed to Royal.

(5)     Evidence of alleged fraudulent omissions by CMC concerning the nature or status of leases not bonded by Royal.

(6)     Evidence of alleged fraudulent omissions concerning the nature or status of CMC leases originally bonded by Frontier Insurance Company and AmWest Surety Company, which Royal agreed to re-bond in December 2000.

(7)     Any contention that CMC misrepresented the loss ratio of its lease portfolio.

(8)     Any contention that misrepresentations or omissions occurring after November 3, 2000 fraudulently induced Royal to issue lease bonds.

(9)     Evidence of the 2008 indictments, or the 2010 convictions, of Sterling Wayne Pirtle, Ronald Fisher, Mark Fisher and/or Nancy Fisher.

(10)    Any contention or testimony that CMC operated a Ponzi scheme.

With respect to each of these categories of evidence, CadleRock's argument is based primarily on Fed. R. Evid. 401, 402 and 403.  Fed. R. Evid. 402 provides that "[i]rrelevant evidence is not admissible."  Fed. R. Evid. 401 states that evidence is relevant if "(a) it has any

tendency to make a fact more or less probable than it would be without the evidence; and (b) the

fact is of consequence in determining the action."  Finally, even if evidence is relevant, Fed. R.

Evid. 403 provides that the Court may exclude evidence in its discretion on several grounds,

including "unfair prejudice, confusing the issues, misleading the jury . . . or needlessly

presenting cumulative evidence."  CadleRock contends that each of the categories of evidence

listed above should be excluded because it is irrelevant or, even if relevant, is unduly prejudicial,

or runs the risk of confusing or misleading the jury.

The Court addresses each category of evidence identified by CadleRock in turn.


**DISCUSSION**

As an initial note, CadleRock's Motion in Limine provides little specificity as to the

documents and evidence it seeks to exclude.  Both parties have presented the Court with general

arguments as to various categories of evidence, and the Court has considered the parties'

extensive briefing.  In most cases, however, the Court has concluded that determinations on the

issues raised are premature, and must await a factual framework in the context of a specific

evidentiary proffer.  Thus, while the Court has denied CadleRock's Motion in Limine, the Court

has attempted herein to delineate the scope of evidence relevant to Royal's fraudulent

inducement claim.  To the extent CadleRock believes that a specific evidentiary proffer by Royal

is inconsistent with the standards articulated by this Court in this Opinion (as well as the Court's

other rulings on the various Motions in Limine), CadleRock is free to object to such proffer at

trial.

A.      **Evidence Relating to Effectiveness of Leases or Bonds**

In support of the exclusion of the evidence listed under category 1, CadleRock relies in

4

part on statements by Royal's counsel during the first bench trial.  Among the issues in that trial was whether the parties intended the lease bonds to be effective upon issuance, or whether the effective date of the lease bonds was intended to be delayed to coincide with the "second stage" of the transaction, the execution of the Sale and Servicing Agreements ("SSAs").

During the first bench trial, Royal argued, and the Court found, that the parties intended a two-stage transaction, whereby the bonds would be effective immediately upon issuance. CadleRock's argument here apparently is premised on the theory that Royal cannot both argue its "two-stage" transaction theory (premised on the parties' intent to make the lease bonds immediately effective), and claim that the bonds are void based upon fraud in the inducement.

In taking this position, CadleRock also relies on the Bench Trial Opinions, in which Judge O'Malley found that "(1) valid leases were in effect prior to execution of the [assignment]; and (2) equipment had been delivered to the lessee prior to execution of the [assignment]." Bench Trial Opinion I, 02-16000, Doc. 2459, at 71.  Apparently based upon these findings, CadleRock argues, "[T]he law of the case is that all the leases at issue are fully effective and the bonds therefore are fully effective.  Any evidence as to the effectiveness of the leases is irrelevant. . . ." (02-16012, Doc. 118, at 5).

In its lead memorandum in opposition (02-16012, Doc. 142), Royal responds that it never took any position during the Bench Trials, nor did the Court make any finding, inconsistent with Royal's fraud in the inducement defense.  Rather, Royal asserts, CadleRock's argument is tautological and ignores the dispositive finding made by the Court in the Bench Trial Opinions: Royal's bonds were fully effective upon issuance, <u>in the event their issuance was not induced by fraud</u>. (02-16012, Doc. 142, at 14).

The Court agrees with Royal.  Judge O'Malley, in the Bench Trial Opinions, determined

that the parties intended to effectuate two-stage transactions, with leases and bonds in effect prior to the execution of the SSAs.  The Bench Trial Opinions never considered, however, whether the bonds were <u>fully effective despite fraud by CMC</u>—that was precisely the issue reserved for determination in the jury trial now scheduled.  As Royal notes, "it is in the very nature of a defense that a contract was induced by fraud that, but for the fraud, there would be a valid and binding contract. . . ." (02-16012, Doc. 142, at 15).

The portion of the CadleRock Motion in Limine seeking to exclude evidence relating to the effectiveness of the leases and bonds is <u>denied</u>.

### B.  Evidence Challenging the Amounts Due under the Leases

In support of exclusion of any evidence challenging the amounts due under the leases, CadleRock relies on a waiver of defenses clause contained within each lease.  CadleRock argues that such waivers of defenses are permitted by UCC § 9-403, and cites case law in support of the proposition that California courts enforce such waivers of defenses. *See, e.g., Wells Fargo Bank Minnesota, N.A. v. B.C.B.U.*, 143 Cal. App. 4th 493 (4th Dist. 2006).  Further, CadleRock states, there is no dispute regarding the payments made by or on behalf of the lessees, and thus there is no reason to present evidence of delinquencies or defaults within the three Royal lease pools.

In its lead memorandum in opposition (02-16012, Doc. 142), Royal states that it does not dispute the aggregate original principal amounts of the lease bonds.  It notes, however, that calculation of the net balance owed involves considering payments received by seven different entities, from six different sources, over a period of eleven years.  Royal further states that it is engaged in discussions with CadleRock, in an attempt to reach a stipulation as to the amounts that have been paid.

The parties further disagree, Royal notes, as to the manner in which prejudgment interest

6

should be computed—i.e., whether payments should be credited to principal or interest, and whether simple or compound interest applies.  Royal states that these issues are properly determined by the Court at the damages stage, after the Court has rendered its verdict on liability on both CadleRock's claim and Royal's counterclaim.

Initially, CadleRock's argument that the Court can determine the amount due under the leases based simply upon a waiver of defenses clause is baffling.  Even assuming that Royal were barred from asserting any defenses against the full amount due to CadleRock, CadleRock still would bear the burden of demonstrating the amount properly due and owing.  CadleRock has provided the Court with no facts demonstrating that it can satisfy that burden.

The Court agrees that this inquiry is premature and is properly deferred to the damages stage of the litigation.  The parties may succeed in reaching a satisfactory stipulation as to these issues or, depending on the outcome of the trial, the jury's verdict may render the issue moot.[5] The portion of the CadleRock Motion in Limine seeking to exclude evidence challenging the amounts due under the leases is underlined denied without prejudice.

### C.  Evidence of Alleged Fraudulent Omissions Concerning the Business of CMC

As to category 3 of the evidence listed in its motion, CadleRock seeks to exclude evidence of alleged omissions by CMC concerning its general business operations.  This position is based on CadleRock's interpretation of this Court's prior opinions as holding that express misrepresentations—rather than omissions—are required to support a claim for fraudulent inducement.  CadleRock cites language in Bench Trial Opinion I, where this Court stated: "Initially, therefore, in order to prevail on the fraudulent inducement defense, [Royal] must

---

[5] In an attempt to streamline the issues for trial, and avoid jury confusion (and the attendant risk of a compromised verdict), the Court proposes to the parties the following procedure.  The Court will limit the jury trial currently scheduled to liability issues, and to Royal's affirmative defense of fraudulent inducement.  The parties could stipulate that, based upon the jury's verdict, the issue of damages will be submitted for Court determination.  The Court's decision under the proposed procedure would be limited to the issue of damages, with the right to appeal.

present evidence as to the misrepresentations made by CMC, and evidence as to the falsity of those representations. . . ." (02-16000, Doc. 2459, at 179).

CadleRock argues, initially, that Royal is unable to present any admissible, non-hearsay evidence of actual representations by CMC regarding its business, because all communications with CMC occurred either through Anthony & Morgan Surety & Insurance Services, Inc. ("A&M"), the surety broker retained by Royal, or Royal's subsidiary, Custom Risk Solutions ("CRS").  Thus, CadleRock contends, Royal will seek to support its fraud in the inducement defense through evidence that CMC had a duty to disclose material information to it, and that it failed to do so.

CadleRock asserts that CMC had no duty to provide any information to Royal, because Royal never requested any information from CMC.  To the contrary, CadleRock argues, the Royal lease bonds placed the underwriting risk on Royal as a matter of law.  In the face of the lease bond provision expressly allocating the risk to Royal, CadleRock contends that Royal should be precluded from arguing that it relied upon CMC to volunteer derogatory information about itself or its lessees.  CadleRock thus apparently also takes the position that the language of the lease bond provision serves to preclude Royal as a matter of law from introducing evidence of material omissions by CMC.

In its lead memorandum in opposition (02-16012, Doc. 142), Royal first disputes CadleRock's assertion that the Bench Trial Opinions preclude it from introducing evidence of material omissions by CMC.  Royal maintains that the Bench Trial Opinions never drew any distinction between affirmative representations and fraudulent omissions.  In fact, Royal points out, Judge O'Malley specifically held in Bench Trial Opinion I that Royal was entitled to prove its fraud in the inducement defense through either "a false representation or concealment of a

8

material fact. . . ." (02-16000, Doc. 2459, at 178-79), *citing South Tahoe Gas Co. v. Hofmann Land Improv. Co.*, 25 Cal. App. 3d 750, 765 (1st Dist. 1972).  Royal further cites to California case law, as well as the Judicial Council of California Civil Jury Instructions, to support the proposition that California law recognizes a fraudulent inducement defense based on fraudulent concealment. *See, e.g., Melanson v. United Air Lines, Inc.*, 931 F.2d 558, 563 (9th Cir. 1991)(citing Cal. Civ. Code §§ 1709-1710); *Boschma v. Home Loan Ctr., Inc.*, 129 Cal. Rptr. 3d 874, 890 (4th Dist. 2011); Judicial Council of California Civil Jury Instructions ("CACI") No. 335 (Affirmative Defense – Fraud); CACI No. 1901 (Concealment).

Moreover, Royal argues, CadleRock's suggestion that the Court can determine issues of duty and risk allocation as a matter of law, on a motion in limine, is legally untenable.  In Royal's view, the central issue with respect to any misrepresentations or omissions by CMC is the materiality of any such representations or omissions.  Royal asserts that materiality is a jury question, and that granting CadleRock's requested relief would improperly remove these matters from the province of the jury.

Royal relies on *Sumitomo Bank of California v. Iwasaki*, 70 Cal. 2d 81, 90 (1968) which set forth the standard for material nondisclosures by an obligee:

> Where before the surety has undertaken his obligation the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor also has reason to believe that these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts is a defense to the surety.

*Id.*, (quoting Restatement – Security & Suretyship and Guaranty, § 124(1)).

Royal contends that omissions by CMC relating to its business—evidence of which CadleRock seeks to exclude—are central to the risk Royal intended to assume.  Royal claims that

in agreeing to bond the three CMC lease pools, the risk it intended to assume was that the protections and reserves, as represented by CMC, would fail, and thus that surety payments would be required.

Royal asserts that, under California law, the "materiality" of a misrepresentation or nondisclosure is merely one aspect of the justifiable reliance inquiry, and as such is clearly a fact question for jury determination. *See OCM Principal Opportunities Fund v. CIBC World Mkts. Corp.*, 68 Cal. Rptr. 3d 828, 863 n.17 (2d Dist. 2007)("[u]nder California law, materiality in the context of fraud is generally examined as an aspect of justified reliance . . . ."). Royal cites to a several cases delineating the scope of the "reliance" element of its defense under California law.

According to Royal, California law requires it to prove only that, had CMC disclosed the allegedly concealed information, Royal would not have issued the surety bonds. *See, e.g., Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993); *Sangster v. Paetkau*, 68 Cal. App. 4th 151, 170 (1st Dist. 1998)("reliance may be established on the basis of substantial evidence showing the alleged fraudulent misrepresentation or concealment substantially influenced the party's choice, even though other influences may have operated as well . . . .").

Royal contends that reasonable reliance is a fact question, and that Court determination of this question—based upon the language of the lease bonds or otherwise—would invade the province of the jury.  According to Royal, if CadleRock had believed that Royal had insufficient evidence to support its fraudulent inducement defense, CadleRock should have sought leave to make a post-discovery motion for summary judgment.

Royal further maintains that the standards set forth in *Sumitomo*—not the standards articulated by CadleRock—govern whether CMC actually had a duty to disclose facts to Royal. According to Royal, California law would require CMC to disclose information in three

10

circumstances: (1) where Royal inquired about any fact that would materially affect the risk it intended to assume, *see Sumitomo*, 70 Cal. 2d at 84 n.2; (2) where CMC knew facts unknown to Royal that materially increased the risk beyond that which CMC had reason to believe Royal intended to assume, and had a reasonable opportunity to communicate those facts to Royal, *see id.* at 965; and (3) where CMC made certain representations, while omitting other material facts that made it likely that the partial disclosure would mislead. *See OCM Principal Opportunities Fund*, 68 Cal. Rptr. 3d at 847, 851.

Finally, Royal urges that it is impermissible for CadleRock to ask the Court to declare, on a wholesale basis, that Royal's evidence relating to CMC's misrepresentations is inadmissible hearsay. Such evidentiary determinations, Royal argues, must be made in context, with regard to specific documents and specific testimony.[6] Royal asserts that it will present ample admissible proof at trial of material misrepresentations by CMC. Moreover, Royal contends, it requested considerable information from CMC, which gave rise to a duty to disclose on CMC's part.[7]

In its lead reply memorandum of law (02-16012, Doc. 154), CadleRock first relies on the Court's determination, in the Bench Trial Opinions, that Royal's fraudulent inducement defense was limited to fraud by CMC in its capacity as obligee. CadleRock claims that this finding

---

[6] Royal raises two additional points in response to CadleRock's hearsay argument: (1) Royal contends that, since CadleRock stands in the shoes of CMC as an assignee, admissions of CMC and its principals constitute admissible evidence against CadleRock; and (2) Royal points out that the Court's Case Management Plan (02-16000, Doc. 22) contains a provision by virtue of which the parties agree that documents produced in this case shall be deemed to be authentic, unless the producing party specifies (in accordance with the provisions of the Case Management Plan) that the document may not be authentic. Royal argues that virtually all the evidence that CadleRock characterizes as hearsay would be admissible either as the admission of a party, or pursuant to the provisions of the Case Management Plan.

[7] In this regard, Royal alleges that CMC made key misrepresentations and omissions relating to its credit scoring program, equipment delivery confirmation, aggressive lease collections, and equipment repossession and re-leasing, all of which were represented to result in net losses of 2 to 4 percent of the value of the lease payments. Royal asserts that the bulk of these representations were false, and that CMC also made crucial omissions, including its failure to disclose the default of some $30 million of "Shandoro Group" leases (approximately 50 percent of CMC's lease portfolio) in May 2000.

precludes Royal from introducing evidence of any misrepresentations or omissions by CMC except those specifically relating to obligations CMC undertook as an obligee on the lease bonds issued by Royal.  In other words, CadleRock argues that any representations or omissions regarding CMC's servicing operations—even if those representations were made prior to Royal's issuance of the bonds—cannot constitute representations or omissions made in CMC's obligee capacity.  Rather, CadleRock urges, the only representations or omissions on which Royal may rely are those relating specifically to a particular lease bond or lessee in Royal's pools.

Second, CadleRock relies on language in Bench Trial Opinion I, in which the Court questioned the type of evidence that could support the Sureties' fraudulent inducement defense:

> The Sureties have suggested that a broad range of circumstances, including (1) fraudulent general representations by CMC as to its overall Lease Bond program; or (2) fraudulent activities by the lessees with respect to particular leases, could cut off the Sureties' liability on their Lease Bonds.  While the Court will not render advisory determinations as to factual scenarios that have not been presented, the Court expresses significant skepticism with respect to these arguments.
>
> ***
>
> Additionally, to the extent the Sureties argue that broad, general misrepresentations by CMC as to its Lease Bond program can relieve the Sureties of liability even as to legitimate leases, the Court is similarly doubtful as to the validity of that proposition.  In the Court's view, analysis of the Sureties' fraud in the inducement defense will require individual examination of the Lease Bond transactions, to determine the falsity and materiality of the representations made by CMC in each transaction.

(02-16000, Doc. 2459, at 179-80).

CadleRock argues the court's statements also operate to bar Royal from introducing evidence as to misrepresentations or omissions by CMC as to issues other than those directly related to the existence, validity or quality of the 259 Royal lease bonds—including fraudulent

omissions by CMC relating to its business operations.

In this regard, CadleRock urges that the risk Royal intended to assume under its bonds was merely the risk that the lessees would fail to make sixty monthly payments under the leases. Since CMC was the obligee, CadleRock reasons, Royal could not have intended to assume any risks of CMC's non-performance.  Accordingly, representations or omissions relating to risks other than the lessees' non-performance could not have been material as a matter of law.

The Court has reviewed both the prior Bench Trial Opinions and the *Sumitomo* case. I find no authority for CadleRock's argument that mere <u>nondisclosure</u> is insufficient to support a fraudulent inducement defense.  The Court's analysis of *Sumitomo* in Bench Trial Opinion I related to the reliance element of the fraudulent inducement defense, and did not address whether nondisclosure of material facts could support that defense.  Overall, however, the Restatement makes clear that a material nondisclosure can support a fraudulent inducement defense. I see no reason to conclude that *Sumitomo* or other California case law precludes basing a fraudulent inducement claim based on nondisclosure.  Accordingly, Royal is not barred from supporting its fraudulent inducement defense with evidence of material nondisclosures by CMC.

Further, with respect to CadleRock's arguments that I should exclude as hearsay Royal's evidence of misrepresentations by CMC, I decline to make such a finding at this time.  In advancing this argument, CadleRock has not identified any particular document or testimony, and I refuse to make evidentiary determinations in a vacuum.  CadleRock is free to raise specific objections to Royal's evidentiary proffers at trial.

As to CadleRock's contention that the language of the lease bonds limits the scope of Royal's fraudulent inducement defense, the Court has addressed this issue in numerous previous Opinions.  CadleRock's argument appears to suggest that the lease bonds effect a waiver of

certain elements of Royal's fraudulent inducement defense based on the fraud waiver provision contained in the lease bonds. Bench Trial Opinion I, where the Court found that Royal was entitled to assert its fraud in the inducement defense against CadleRock as an assignee of CMC, directly resolved this issue against CadleRock. (02-16000, Doc. 2459).

The Court also, however, recently issued an Opinion on Royal's Motion in Limine 2 (02-16012, Doc. 176), in which Royal sought an Order precluding CadleRock from introducing any evidence of the existence of the fraud waiver provisions. In its Order on Motion in Limine 2, the Court denied Royal's requested relief, holding that CadleRock was entitled to present evidence of the fraud waivers, and the other risk allocation language contained in the lease bonds. In other words, while the Court has held that Royal is entitled to assert its fraud in the inducement defense, and the Court will not bar that defense based upon language contained in the lease bonds, the Court also has held that CadleRock is entitled to introduce evidence of the lease bond language, as it may bear on the reliance element of Royal's affirmative defense.

With respect to CadleRock's arguments relating to the proper scope of Royal's fraudulent inducement defense, the Court has considered the parties' detailed briefing, and has reviewed the prior Bench Trial Opinions and the applicable case law. In evaluating the proper scope of Royal's proof on its fraudulent inducement defense, the Court is mindful both of (1) the limitations placed on that defense by the Bench Trial Opinions, and (2) the essential role of the jury in determining key facts during this second-phase fraud-in-the-inducement trial.

CadleRock correctly states that, in Bench Trial Opinion I, the Court made certain statements questioning the appropriate scope of a fraudulent inducement defense in these cases, and the evidence that the jury could properly consider in adjudicating that defense. Royal also

14

properly notes, however, that the Court's observations in Bench Trial Opinion I were dicta, since the scope of the defense was not before the Court at that time. It is only now, at the second phase of the trial, against the background of the obligee issue determinations made by the Court in the two Bench Trial Opinions, that the issue comes to the forefront for consideration.

The Court found, in Bench Trial Opinion I, that Royal was entitled to assert its fraudulent inducement defense against CadleRock insofar as Royal predicated that defense on misrepresentations and/or omissions by CMC <u>in it capacity as obligee</u>. The parties agree that this finding precludes Royal from introducing evidence of misrepresentations by CMC after the closing of a lease bond transaction. This is so because by then CMC would have been acting in its capacity as subservicer of the leases, rather than its original obligee capacity. CadleRock argues, however, that the definition of "obligee capacity" is still narrower, and that any representation or omission by CMC not specifically related to the Royal leases and/or lessees could not have been made in CMC's obligee capacity.

The Court declines to adopt such a restrictive construction. In August, 2005, the Lead Opinion found, *inter alia*, that California law prevented a party from enforcing a fraud waiver provision to exculpate itself from its own fraud. *See* 02-16000, Doc. 1708, at 36, *citing Danzig v. Jack Grynberg & Assocs.*, 208 Cal. Rptr. 336, 342 (1st Dist. 1984). The Court's findings in the Bench Trial Opinions—and specifically, the finding that Royal could assert its fraudulent inducement defense against CadleRock as assignee of CMC—were grounded on that basic principle of law. Thus, the significance of the Bench Trial Opinions is that Royal may assert its fraudulent inducement defense against CadleRock to the same extent Royal could have done against CMC.

The Court's finding, in Bench Trial Opinion I, that Royal was barred from introducing

evidence of fraud other than fraud in CMC's obligee capacity was based on the determination that (1) fraud committed by CMC in its capacity as servicer, or (2) fraud committed by parties other than CMC, could not have been fraud in the inducement to enter into the lease bond contracts.   Conversely, however, materially false statements or omissions by CMC during the pre-closing time period—regardless of subject matter—may very well have been part of the inducement to Royal to enter into the lease bond contracts.  The Court has little doubt that such statements would be admissible as against CMC, and as such, they are admissible against CadleRock.  In the Court's view, the materiality of the statements is a fact question for the jury, and an attempt to render such determinations as a matter of law would be both artificial and erroneous.

As noted in the Court's prior Opinions, however, including the Court's Opinion on Royal's Motion in Limine 2, CadleRock will be permitted to introduce evidence of the obligations (including underwriting duties) assumed by Royal, and to argue that Royal could not have justifiably relied on information received from CMC.  In addition, CadleRock will have the opportunity to argue that specific misrepresentations alleged by Royal (1) were not false at the time they were made; or (2) did not actually affect Royal's decision to issue the lease bonds.

The portion of CadleRock's motion seeking to exclude evidence of omissions by CMC relating to its general business is <u>denied</u>.

### D.   Evidence of Information Known to Michael Anthony But Not Disclosed to Royal[8]

As previously noted, the Court reserves decision on issues relating to the evidence described in category 5 of CadleRock's Motion in Limine, for further consideration.

---

[8] I have recast CadleRock's statement of the issue in light of my discussion with the parties on February 13, 2012.

16

### E.    Evidence of Alleged Fraudulent Omissions Concerning Non-Royal Leases

In seeking to exclude the evidence listed in category 5 of its Motion in Limine, CadleRock argues that the only leases at issue in these cases are those which Royal ultimately accepted for bonding in its lease pools.  CadleRock asserts that Royal should be precluded from introducing any evidence that CMC lied as to the credit quality of lessees bonded by other sureties, such as Safeco.  In support of this position, CadleRock again relies on statements made by the Court in Bench Trial Opinion I, where the Court stated, "[A]nalysis of the Sureties' fraud in the inducement defense will require individual examination of the Lease Bond transactions, to determine the falsity and materiality of the representations made by CMC in each transaction . . ." (Doc. 2459, at 180).

In its lead memorandum in opposition (02-16012, Doc. 142), Royal argues that, under the standards articulated in *Sumitomo*, 70 Cal. 2d at 90-91, it is entitled to introduce all evidence relevant to the jury's evaluation of whether CMC misrepresented or intentionally concealed information material to Royal's assessment of the risk it intended to assume.  Royal asserts that CMC's representations as to what its prior business experience had been—including financial data purporting to show delinquencies and defaults in the prior lease pools—were actually false, and formed part of the essential core of information on which Royal relied in deciding to issue the CMC lease bonds.

In this regard, Royal's argument essentially tracks that set forth in subsection (C), above.  Again, Royal contends that the materiality of information allegedly concealed by CMC is a jury question, and that excluding broad categories of evidence from the jury's consideration would invade the jury's fact-finding province.

Royal also takes issue with CadleRock's argument that it is required to show fraud "on a

lease-by-lease basis."  Royal again focuses on the issue of materiality, and urges that the misrepresentations and omissions as to which it seeks to present evidence were "material to the issuance of every Royal lease bond." (02-16012, Doc. 142, at 6).  Royal states that it would not have issued a single bond to CMC had it known that many of the facts provided to it—including the delinquency and default statistics—were false.  Royal argues, accordingly, that the jury is entitled to consider this evidence in evaluating questions of materiality.

In its lead reply memorandum of law (02-16012, Doc. 154), CadleRock also articulates the same arguments discussed in subsections (A) and (C) above, relying on the positions taken by Royal in the prior bench trials, and the findings made by the Court in the Bench Trial Opinions.  CadleRock again argues here that permitting introduction of evidence relating to non-Royal lease pools (1) is inconsistent with the Court's finding that the lease bond transactions were individual, two-stage transactions; and (2) involves alleged misrepresentations and/or omissions by CMC that fall outside the scope of CMC's "obligee capacity," as narrowly defined by CadleRock.  Again, CadleRock argues that evidence of general, global misrepresentations by CMC is not material to the factual determinations that the jury will be required to make.  Rather, CadleRock urges, the jury should conduct an individualized inquiry as to each lease and lease bond.

CadleRock again relies on language contained in Bench Trial Opinion I, which expressed doubt that broad general representations by CMC as to the overall lease bond program could relieve Royal of liability on its bonds as to legitimate leases. (02-16000, Doc. 2459, at 180).  CadleRock asserts that it can demonstrate that none of the 259 leases bonded by Royal in the pools at issue here was fictitious.  Thus, CadleRock contends, there is no evidence that Royal was misled about the risk it undertook under the 259 specific lease bonds issued in its pools.

CadleRock maintains, therefore, any evidence that certain leases bonded by <u>other</u> sureties may have been fictitious, or that CMC may have lied to Royal about its delinquency and default rates on <u>other</u> sureties' leases, is simply irrelevant to Royal's fraudulent inducement defense.

As set forth in detail in subsection (C) above, California law makes clear that the central inquiry is whether Royal was <u>fraudulently induced</u> by CMC to issue the Royal lease bonds in favor of CMC.  As the Court further explained in subsection (C), the Court has declined CadleRock's invitation to impose artificial limitations, as a matter of law, on those misrepresentations or omissions by CMC that might have influenced Royal to issue its lease bonds.  Rather, the Court has found that the central question as to any particular misrepresentation and/or omission by CMC is one of materiality, and as such, is appropriately reserved for jury determination.

For the reasons set forth in subsections (A) and (C), above, the Court declines to exclude the evidence listed in category 5 of the CadleRock Motion in Limine.  Royal will be permitted to introduce evidence that CMC made actual misrepresentations to it, or fraudulently concealed material information, pertaining to the performance of prior CMC leases and lease pools. Questions relating to (1) the falsity of these representations; (2) their materiality; and (3) whether Royal could have reasonably relied on those representations, in light of the information available to it, must be determined by the jury as fact finder.

The portion of the CadleRock Motion in Limine seeking to exclude evidence of alleged fraudulent omissions concerning the nature or status of non-Royal leases is <u>denied</u>.

### F.    Evidence of Alleged Fraudulent Omissions Concerning Leases Originally Bonded by Frontier Insurance Company and AmWest Surety Company

Under category 6 of its Motion in Limine, CadleRock seeks to exclude evidence of alleged fraudulent omissions concerning the nature and status of leases originally bonded by

Frontier Insurance Company ("Frontier") and AmWest Surety Company ("AmWest").   In December 2000, Royal agreed to issue replacement bonds for those leases.   According to CadleRock, Royal has claimed that certain of the Frontier and AmWest leases that it was asked to bond were delinquent, had repossessed equipment, or were in complete default.   CadleRock asserts that Royal is precluded as a matter of law from introducing evidence of the delinquencies and defaults, since on December 12, 2000, CMC advised Royal's subsidiary, CRS, in writing, of the likelihood that defaults and delinquencies would exist in those pools.

In its lead memorandum in opposition (02-16012, Doc. 142), Royal spends little time directly addressing this aspect of CadleRock's Motion in Limine.  Royal states, in a footnote, that it believes that it is barred from introducing evidence as to Royal's issuance of the replacement bonds, or misrepresentations or omissions made by CMC that were specific to the replacement bond transactions.   Royal indicates, however, that it believes it is entitled to introduce evidence as to the Frontier and AmWest lease pools in general, and the performance of those pools, since that evidence goes to the veracity of CMC's representations regarding its business (including the delinquencies and default rate prior to November 2000).  In this regard, Royal again relies on its general argument that the jury is entitled to consider <u>all</u> material misrepresentations and omissions by CMC in determining Royal's fraudulent inducement defense.[9]

CadleRock also does not directly address this issue in its lead reply memorandum (Doc. 154), except to state that this evidence is barred by the Court's previous Bench Trial Opinions,

---

[9] The Court agrees with Royal that evidence pertaining specifically to Royal's issuance of the replacement bonds, as well as representations or omissions made as part of the inducement to Royal to enter into the <u>replacement bond transaction</u>, would not be material to the matters at issue in this trial.  The Court accepts Royal's representation, however, that it does not intend to offer such evidence.  Based upon Royal's representations, the Court considers only the admissibility of evidence of misrepresentations or omissions made by CMC as to the performance of the Frontier and/or AmWest lease pools, as part of the inducement to Royal to enter into the November 2000 lease bond transaction.

and by the narrow scope of Royal's fraudulent inducement defense, as defined by the Court in those Opinions.

Upon review of the parties' briefing, the Court finds that this aspect of CadleRock's Motion in Limine must be denied for the reasons previously articulated in subsections (A) and (C), above.  The Court has declined to restrict the evidence admissible in support of Royal's affirmative defense in the manner suggested by CadleRock; rather, the Court has found that the materiality of each alleged misrepresentation and/or omission by CMC is a factual question properly submitted to the jury.

The portion of the CadleRock Motion in Limine seeking to exclude evidence of alleged fraudulent omissions concerning the nature and status of leases originally bonded by Frontier and AmWest is denied.

### G.    Evidence that CMC Misrepresented the Loss Ratio of its Lease Portfolio

With respect to category 7 of the evidence listed by CadleRock in its Motion in Limine, CadleRock seeks to exclude any assertion by Royal that CMC misrepresented the loss ratio of the lease portfolios being serviced by it.  CadleRock claims that such evidence is inadmissible because such representations would have been mere forecasts of what the ultimate loss ratio would be on those lease portfolios, rather than statements of existing fact.  CadleRock cites to various authorities for the proposition that fraud cannot be based upon predictions, or representations concerning future events. *See, e.g., Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells*, 86 Cal. App. 4th 303, 308 (4th Dist. 2000).

CadleRock claims that the information received by Royal from CMC included (1) data relating to the performance of CMC leases during the time period November 1998 through June 2000; and (2) an analysis of CMC's success in re-leasing equipment repossessed as of June 2000.

21

According to CadleRock, since the vast majority of leases were issued for a sixty-month term, CMC could not possibly have had enough information prior to June 2000 to predict the loss ratio on its prior pools with any degree of confidence.  To the contrary, CadleRock contends, CMC provided Royal with correct data, and simply made incorrect predictions based upon those data.  Thus, to the extent that statements by CMC constituted mere opinion, based upon or extrapolated from the same data provided to Royal, CadleRock argues that Royal should be precluded from introducing those statements.

In its lead memorandum in opposition (Doc. 142), Royal disputes CadleRock's characterization of the statements it seeks to introduce.  Royal states that the factual information provided by CMC contained actual misrepresentations.  For example, according to Royal, that information (1) omitted the defaults by the Shandoro Group, which included some $30 million of leases; and (2) failed to disclose that many of the leases sold by CMC were nonexistent or fraudulent.  Thus, Royal argues, the fraud alleged by Royal is not based upon mere incorrect projections, but includes false representations or material nondisclosures about existing facts.

CadleRock, in its lead reply memorandum (Doc. 154), does not contradict Royal's explanation as to the type of evidence it contemplates introducing at trial.  In fact, CadleRock does not directly address this issue, except to state that this evidence is barred by the Court's previous Bench Trial Opinions, and by the narrow scope of Royal's fraudulent inducement defense, as defined by the Court in those Opinions.

For the reasons set forth in subsections (A) and (C), above, the Court declines to exclude the categories of evidence described by Royal in its opposition memorandum of law.  As previously stated, the Court (1) declines to restrict the evidence admissible in support of Royal's affirmative defense in the manner suggested by CadleRock; and (2) finds that the materiality of

22

each alleged misrepresentation and/or omission by CMC is a factual question properly submitted to the jury.

Further, while the Court recognizes the general proposition that statements based upon future predictions or opinion are not actionable, the categories of evidence described by Royal in its opposition memorandum of law do not appear to run afoul of this rule.  To the extent that CadleRock believes that a particular representation sought to be introduced by Royal is merely a statement of opinion, CadleRock is free to object to Royal's evidentiary proffers on a case-by-case basis.

The portion of CadleRock's Motion in Limine seeking to exclude any evidence or assertion by Royal that CMC misrepresented the loss ratio of the lease portfolios being serviced by it is denied.

### H.    Any Evidence of Alleged Misrepresentations or Omissions by CMC After November 3, 2000

CadleRock seeks to exclude evidence of any alleged misrepresentations or omissions by CMC occurring after November 3, 2000, the date Royal issued its first CMC lease bonds. CadleRock argues that, after November 3, 2000, Royal had appointed A&M as its managing general agent, and had issued its first batch of bonds.  Thus, CadleRock asserts, any representations or omissions by CMC occurring after that date could not have influenced Royal's conduct as a matter of law.

According to CadleRock, Royal withdrew from the CMC program in March 2001, before a substantial portion of the allegedly fraudulent conduct by CMC began.  CadleRock argues, as a result, that Royal is precluded from introducing evidence of any of this later conduct by CMC in support of Royal's claim of fraud in the inducement.

In its lead memorandum in opposition (Doc. 142), Royal does not dispute that the

evidence described by CadleRock is inadmissible to prove Royal was induced to issue its bonds by alleged misrepresentations and/or omissions made <u>after</u> the closing of the lease bond transactions.  Royal argues, nonetheless, that such evidence may be admissible for certain other purposes—including proof of CMC's insolvency at the time the Royal bonds were issued and/or proof of the falsity of CMC's representations.

Once again, CadleRock's lead reply memorandum does not directly address the issues raised by Royal pertaining to this category of evidence.  Nor does it dispute that evidence of conduct by CMC after the closing of the Royal lease pools may, in some circumstances, be relevant to certain narrow elements of Royal's fraudulent inducement defense.

The Court recognizes that, as a general rule, evidence of conduct by CMC after the closing of the Royal lease pools may be irrelevant to the issues at trial.

Royal also acknowledges this point, however, and states that it intends to present evidence of conduct occurring after the closing date of the lease pools only where such conduct relates to a specific element of its affirmative defense—such as falsity of CMC's prior representations.  Under Fed. R. Evid. 404(b), evidence of other acts is admissible to prove such matters as motive, intent, and plan. This rule applies in civil cases, *See generally Dohner v. Neff,* 680 F.2d 588, 589 (6th Cir. 1980)(Rule 404(b) evidence admissible in civil case on issue of intent). Evidence of subsequent acts is admissible under this rule. *See, e.g., United States v. Perry,* 438 F.3d 642, 648 (6th Cir. 2006). Other fraudulent acts, even in unrelated fraud schemes, may be admitted under Rule 404(b) on issues such as fraudulent intent. *See, e.g., United States v Gold Unlimited, Inc.*, 177 F.3d 472, 488 (6th Cir. 1989).

Rule 404(b) is not, however, an unlimited Open Sesame. Any evidence proffered under Rule 404(b) must pass muster under a four-factor test. *See, e.g., United States v. Brown*, 303 F.3d

477, 483 (6th Cir. 2002).

These, clearly, are not issues that I can address in the abstract. Determination of admissibility must await trial.

The portion of the CadleRock Motion in Limine seeking to exclude evidence of any alleged misrepresentations or omissions by CMC occurring after November 3, 2000 is denied.

### I.      Evidence of the 2008 Indictments, or the 2010 Convictions, of Sterling Wayne Pirtle, Ronald Fisher, Mark Fisher and/or Nancy Fisher

CadleRock seeks to preclude Royal from introducing any evidence that Sterling Wayne Pirtle, Ronald Fisher and Mark Fisher were indicted for and pleaded guilty in the United States District Court for the Southern District of California to charges of tax evasion and bank fraud.[10] CadleRock argues that all of these crimes were committed after Royal had terminated its relationship with CMC, and thus cannot be probative of any issue the jury will be called upon to decide.  Moreover, since none of these individuals will be called on to testify at trial, the character of these individuals for truthfulness will not be at issue.  As such, CadleRock argues that evidence as to the convictions of the CMC principals is both irrelevant and unfairly prejudicial.

In Royal's memorandum in opposition to CadleRock's Motion in Limine Issue No. 9 (Doc. 137), Royal disputes CadleRock's assertion that all of the conduct involved in the convictions occurred after Royal had withdrawn from the CMC program.  Royal notes that each of the CMC principals pleaded guilty to fraudulent conduct that included the failure "to purchase equipment underlying at least $70 million worth of 'leases' that they included and kept in lease pools CMC sold to financial institutions. . . ." (02-16012, Docs. 139-2, 139-4, and 139-5, at 6).

---

[10] Although the CadleRock Motion in Limine refers to the conviction of Nancy Fisher as well as those of Pirtle, Ronald Fisher, and Mark Fisher, Royal does not make reference to the conviction of Ms. Fisher, and it does not appear that Royal intends to introduce evidence relating to the conviction of Ms. Fisher.

Based on the guilty pleas, the Court sentenced each of the defendants to prison, and also sentenced each to pay restitution of $61,212,047.00.

Royal points out that the Court's restitution order for each defendant reflected the amount unpaid on $72,965,412.00 of "unfunded" leases sold by CMC—that is, leases as to which no equipment had been purchased. The schedule of "unfunded" leases submitted by the United States in support of the restitution provisions of the judgment included $18,819,429.00 of purported leases sold by CMC between September 1998 and November 10, 2000—that is, prior to the issuance of any of the Royal lease bonds. (02-16012, Docs. 139-7, 139-8, 139-9).

Given the admissions by all three CMC principals that they "intentionally failed to purchase equipment underlying at least $70 million worth of 'leases . . .,'" and the consistency of the restitution provisions of the judgments with the admissions made in the plea agreements, Royal argues that the Southern District of California necessarily found that CMC had included unfunded leases in lease pools beginning in September 1998.

Royal asserts that CMC committed fraud in the inducement by telling it, among other things, that the leases in its lease bond program were bona fide leases, with equipment in place. According to Royal, evidence that CMC had sold $18.8 million of unfunded leases prior to Royal's entry into the lease bond program thus is material to Royal's fraudulent inducement defense.

In addition to being relevant, Royal argues that evidence of the CMC principals' criminal convictions is admissible under several provisions of the Federal Rules of Evidence.  First, Royal asserts, this evidence is admissible pursuant to Fed. R. Evid. 803(22), which provides for the admission of "evidence of a final judgment of conviction if . . . entered after a . . . guilty plea . . . for a crime punishable by death or by imprisonment for more than a year . . . to prove any fact

26

essential to the judgment." Since the CMC principals' admissions in their plea agreements and guilty pleas, as well as the information contained in the motions for restitution, were facts necessary to sustain the judgments, Royal contends that all of this evidence, as well as the Judgments themselves, may be admitted pursuant to Fed. R. Evid. 803(22).

Royal argues, second, that the criminal convictions are admissible under Fed. R. Evid. 803(8), as factual findings from a governmental investigation. That section provides that a public record is not hearsay if "it sets out . . . in a civil case . . . factual findings from a legally authorized investigation; and neither the source of information nor other circumstances indicate a lack of trustworthiness . . . ." Fed. R. Evid. 803(8). Royal argues that the plea agreements and the motions for restitution embody the investigation of the United States Attorney's Office in the Southern District of California. Royal further asserts that courts have permitted plea agreements and statements of fact under this provision of the Federal Rules of Evidence, citing to *United States v. Seventy Thousand One Hundred Fifty Dollars in United States Currency ($70,150.00)*, 2009 WL 3614871, *3-4 (S.D. Ohio).

Third, Royal argues, the plea agreements contain incriminating statements made by the CMC principals, and as such are admissible as statements against interest pursuant to Fed. R. Evid. 804(B)(3).[11] That provision exempts from the hearsay rule any statement that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or . . . to expose the declarant to civil or criminal liability . . . ."

Royal argues, finally, that admitted evidence of the criminal convictions of CMC's principals will not unfairly prejudice CadleRock because those convictions relate to the very

---

[11] Fed. R. Evid. 804 requires that the declarant be unavailable to testify; however, the parties do not dispute that Sterling Wayne Pirtle, Ronald Fisher and Mark Fisher are all currently incarcerated and beyond the subpoena power of this Court.

fraud at issue in this case.  Fed. R. Evid. 403 prohibits the introduction of otherwise relevant evidence when "its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."  Since the CMC principals admitted to conduct that began prior to Royal's involvement in the CMC program, Royal argues, any impact that this evidence would have on the jury would be a result of the legitimate probative value of the evidence, not any unfair prejudice.  Particularly here, where CadleRock stands in the shoes of CMC, Royal argues that admitting evidence of fraud by CMC would in no way influence the jury to render its decision on any improper basis.

In CadleRock's lead reply memorandum (Doc. 154), CadleRock argues, first, that evidence of the convictions of CMC's principals is inadmissible because that evidence would not involve representations made to Royal by CMC in its obligee capacity.  Further, CadleRock argues, Royal's proffered evidence relating to the criminal convictions is overbroad, has nothing to do with the 259 legitimate leases in the Royal lease pools, and is extremely prejudicial to CadleRock.

CadleRock contends that the conduct to which the CMC principals pleaded guilty includes a broad range of conduct spanning many years, which includes conduct involving lease pools other than the Royal pools.  Further, CadleRock argues, Royal offers this evidence to demonstrate fraud by CMC in the management of its overall lease bond program, not specific fraudulent representations to Royal.  CadleRock asserts that nothing about the convictions of the CMC principals provides any relevant evidence relating to CMC's conduct as an obligee on the Royal lease bonds.  Moreover, CadleRock maintains, the restitution issue was not fully litigated, and the Court did not scrutinize the transactions underlying the government's restitution calculation.  Rather, the Court simply adopted the numbers submitted by the government without

making detailed factual findings.

Finally, CadleRock argues, admission of evidence relating to the convictions of the CMC principals would be enormously prejudicial, and would be likely to confuse and mislead the jury. CadleRock urges that the Court should exclude this evidence since any probative value it may have is far outweighed by the danger of unfair prejudice to CadleRock.

As with the evidence of other fraudulent acts, a determination of the admissibility of evidence derived from the convictions of CMC principals must await trial. Only then can the balancing required under Rule 403 between probative value and risk of substantial prejudice or juror confusion be assessed adequately. Of particular concern will be whether the facts which Royal seeks to prove through this evidence are either undisputed or provable through other evidence.

Subject to the principles outlined above, the portion of the CadleRock Motion in Limine seeking to exclude evidence of the 2008 indictments, or the 2010 convictions, of Sterling Wayne Pirtle, Ronald Fisher, and/or Mark Fisher, is <u>denied</u>.

**J.      Any Contention or Testimony that CMC Operated a Ponzi Scheme**

In seeking to exclude the evidence described under category 10, CadleRock argues that Royal is required to prove its fraudulent inducement defense on a lease-by-lease basis, by introducing evidence of fraud <u>with respect to the specific leases at issue</u>.  CadleRock asserts that evidence relating to (1) CMC's financial strength; and (2) whether CMC will be able to fulfill its obligations to Royal as subservicer, does not involve representations made by CMC in its obligee capacity, and thus is neither relevant nor admissible.  CadleRock contends that the fact that CMC had a Ponzi-type business model, and thus might not have been able to sustain its lease origination and servicing business, is of consequence only to issues of operational management

by CMC, and not to inducement to Royal to enter into the lease bond contracts.

In its lead memorandum in opposition (Doc. 142), Royal again argues that it is entitled to introduce all evidence relevant to the jury's evaluation of whether CMC misrepresented or intentionally concealed information material to Royal's assessment of the risk it intended to assume.  Royal asserts that among the evidence relevant to its affirmative defense is evidence that, in May 2000, the Shandoro Group defaulted on some $30 million in leases, and that CMC covered up that default by making "Ponzi"-type payments of $1.4 million per month.

CadleRock's reply memorandum does not directly address this issue, other than to state that CMC's alleged practice of covering delinquencies in lease pools with funds raised from the sale of phantom pools is irrelevant to the Royal lease bonds.  CadleRock again articulates its general argument that Royal must prove fraud on a lease-by-lease basis, and that evidence of misrepresentations by CMC as to matters relating to its general business operations cannot support Royal's fraudulent inducement claim.

In fact, it is unclear to the Court precisely what evidence Royal intends to proffer relating to an alleged "Ponzi" scheme by CMC, or which evidence CadleRock seeks to exclude under this category.  As such, it appears that these evidentiary matters will require determination in context.  Clearly, to the extent that Royal seeks to introduce evidence simply that CMC was likely to fail, and that its business model was not sustainable, such evidence might well be no more than "proof of mere mismanagement and operational incompetence by CMC . . . ." Bench Trial Opinion I, 02-16000, Doc. 2459, at 179. If so, such evidence would be irrelevant to Royal's fraud claim.  To the extent Royal seeks to prove, however, that CMC lied to it about matters of present fact prior to Royal's issuance of the lease bonds, the Court adheres to its prior findings that: (1) Royal is not precluded from introducing such evidence; and (2) questions of the

materiality of such representations are issues for jury determination. *See* subsections (A) and (C), *supra*.

The portion of the CadleRock Motion in Limine seeking to preclude Royal from introducing evidence that CMC operated a Ponzi scheme is <u>denied</u>.

## CONCLUSION

For the reasons set forth herein, it is hereby

ORDERED THAT CadleRock Motion in Limine (02-16012, Doc. 118; 02-16019, Doc. 86; 02-16022, Doc. 94) be, and the same hereby is denied, without prejudice to make specific evidentiary objections during the trial of this matter, with the exception of issues relating to CadleRock's Issue 4. The Court reserves decision as to CadleRock's Issue 4, for further consideration.

So ordered.

<u>/s/ James G. Carr</u>
Sr. U.S. District Judge